| | |
|---|---|
| **BROOKDALE SENIOR LIVING INC. et al.,** | **CIVIL ACTION NO. 5:13-290-KKC** |
| **Plaintiffs,** | |
| **V.** | **OPINION & ORDER** |
| **TERESA STACY, Administratrix of the Estate of Anna Stacy,** | |
| **Defendant.** | |

**\*\*\* \*\*\* \*\*\***

This matter is before the Court on a motion by the three plaintiff corporations to compel arbitration and enjoin the defendant from pursuing her parallel suit in state court. (DE 7). Defendant Teresa Stacy, administratrix of the Estate of Anna Stacy, objects to the motion and has filed her own motion to dismiss. (DE 5). She contends that this Court lacks subject-matter jurisdiction; that it should abstain from hearing this action in light of the pending state-court matter; that the arbitration agreement at issue is invalid and unenforceable; and that the Court should not exercise its power to enjoin her from continuing the prosecution of her state-court action. For the following reasons, the Court will deny the defendant's motion to dismiss, and grant the plaintiffs' motion to compel arbitration and enjoin the defendant.

## I.

On July 30, 2013, Defendant Teresa Stacy filed a negligence suit in Fayette Circuit Court in Fayette County, Kentucky regarding the care and treatment of Anna Stacy during her residency at Homewood Residence at Richmond Place. *See Teresa Stacy, Administratrix*

*of the Estate of Anna Stacy, deceased v. Brookdale Senior Living, Inc., et al.*, Civil Action File No. 13-CI-03145 (Circuit Court of Fayette County, Ky., Division 9). The plaintiffs subsequently filed the instant suit on September 4, 2013, alleging that Stacy's claims in state court are subject to a binding arbitration agreement and she should be enjoined from proceeding any further with her state-court action. The plaintiffs invoke this Court's diversity jurisdiction and seek relief under the § 4 of the Federal Arbitration Act (FAA). Stacy, on the other hand, contends that the arbitration agreement is invalid and unenforceable. But perhaps more importantly, she submits that this Court lacks subject-matter jurisdiction, or in the alternative, the Court should abstain from hearing the present action under the doctrine of *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).

The arbitration agreement in this case was a mandatory component of Stacy's Residency Agreement for her stay at Homewood Residence. Section V of the Residency Agreement was titled "Arbitration and Limitation of Liability Provision," which contained three subsections. On its face Section V purports to make severable any provisions the Court might deem unenforceable. It states that if "any of sub-sections A, B or C provided below, or any part thereof, be deemed invalid, the validity of the remaining sub-sections, or parts thereof, will not be affected." (DE 1-1, at 7).

Subsection A outlines the provisions of the arbitration agreement. The first sentence of Subsection A states the follow:

> Any and all claims or controversies arising out of, or in any way relating to, this Agreement or your stay at the Community, excluding any action for eviction, and including disputes regarding interpretation of this Agreement, whether arising out of State or Federal law, whether existing or arising in the future, whether for statutory, compensatory or punitive damages and whether sounding in breach of contract, tort or

> breach of statutory duties, irrespective of the basis for the duty or the legal theories upon which the claim is asserted, shall be submitted to binding arbitration, as provided below, and shall not be filed in a court of law.

(DE 1-1, at 7). The next sentence in Subsection A states in bold text that **"[t]he parties to this Agreement further understand that a jury will <u>not</u> decide their case**." (DE 1-1, at 7).

Following Subsection A was the "Limitation of Liability Provision," which purports to limit the amount of damages each party would have to pay in the event of future litigation. This provision, marked as Subsection B, is distinct from the prior provisions outlining the arbitration requirements.

Finally, Subsection C is titled, "Benefits of Arbitration and Limitation of Liability Provisions." This subsection outlines what the parties agree are the benefits of the arbitration agreement and limitation of liability. It states that "[t]he parties' decision to select arbitration is supported by the potential cost-effectiveness and time-savings offered by selecting arbitration, which may avoid the expense and delay of judicial resolution in the court system." (DE 1-1, at 10). Significantly, at the end of Subsection C, and again in bold, emphasized text, the agreement states as follows:

> **The undersigned acknowledges that he or she has been encouraged to discuss this Agreement with an attorney.**
>
> **The parties to this Agreement further understand that a jury will <u>not</u> decide their case.**

(DE 1-1, at 10).

## II.

Stacy begins with several arguments as to why this Court must dismiss the case for lack of subject-matter jurisdiction. Although the plaintiffs seek to compel arbitration under § 4

of the FAA, this is not sufficient to create federal question jurisdiction. "The [FAA] is something of an anomaly in the field of federal-court jurisdiction. It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331 . . . or otherwise." *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 25, n. 32 (1983). Because of this, courts must have an independent jurisdictional basis for hearing a claim brought under § 4. *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581–82 (2008). The plaintiffs pleaded that this Court has subject-matter jurisdiction on the basis of complete diversity, as the defendant is a citizen of Kentucky and the three corporate plaintiffs are not.

## A. Diversity Jurisdiction

Stacy challenges the plaintiffs' claim of complete diversity on the grounds that at least one of the corporate entities is a limited liability corporation with a member who is a citizen of Kentucky. But her claim lacks even a scintilla of support: the complaint indicates that two of the plaintiffs are Delaware corporations and the third is a Tennessee corporation. All three of the plaintiffs have a principal place of business in Tennessee. Stacy does not indicate which corporation has one or more members residing in Kentucky; she does not indicate who those members might be; and she offers no proof that the plaintiff corporations are LLCs and subject to the alternative test for determining citizenship. Moreover, her own state-court complaint alleges that the three plaintiffs are foreign corporations. (DE 1-2, at 2–4). Claiming otherwise in her motion to dismiss without offering any evidence as support borders on a frivolous waste of the Court's and the plaintiffs' time.

## B. The Effect of *Vaden v. Discover Bank*

The second argument for dismissal relates to the absence of Terri Schneider, an administrator at Homewood Residence, from the instant case. Schneider has been named as a defendant in Stacy's underlying state suit, but she is not a party in the present matter. Presumably, she has been left out so that the plaintiff corporations can seek enforcement of their arbitration agreement in federal court, as Schneider's Kentucky citizenship would destroy diversity jurisdiction. Stacy contends that the Court must consider Schneider's citizenship to determine diversity, either because the Court should "look through" to the underlying controversy—of which Schneider is a party—or because she is an indispensable party under Rule 19(b).

To support her first claim that this Court should "look through" to the underlying case when determining whether diversity jurisdiction exists, Stacy cites *Vaden v. Discover Bank*, 556 U.S. 49 (2009). In *Vaden*, Discover Bank sued a credit card holder in state court to recover past-due charges. The credit card holder filed a counterclaim, also asserting state-law claims. But Discover Bank believed these claims were preempted by federal law, and filed an action in federal district court to compel arbitration of the counterclaims. The Supreme Court held that the district court lacked jurisdiction because the federal issue arose within the context of the state-court counterclaim, and federal courts cannot consider counterclaims when assessing federal question jurisdiction. Accordingly, the Supreme Court directed district courts to "look through" the arbitration action and determine whether federal question jurisdiction exists based on the underlying state-court suit. *Id.* at 62.

Stacy submits that the logic of *Vaden* applies with equal force in cases resting on diversity jurisdiction. She argues that the Court should look through the instant action and

determine whether it would have jurisdiction over the state suit, which includes the non-diverse Terri Schneider. The argument is not without its strong points. In *Vaden*, the Supreme Court explained that a district court has jurisdiction in cases arising under § 4 of the FAA "only if, 'save for' the [arbitration] agreement, *the entire, actual 'controversy between the parties,' as they have framed it*, could be litigated in federal court." *Id.* at 66 (emphasis added). One could plausibly read this language as requiring district courts to look at the entire controversy in the state court to determine if it has diversity jurisdiction.

But the Supreme Court limited its approval of the "look through" doctrine to cases involving federal question jurisdiction. The Court stated it

> approve[s] the "look through" approach *to this extent*: A federal court may 'look through' a § 4 petition to determine whether it is predicated on an action that 'arises under' federal law; in keeping with the well-pleaded complaint rule . . . a federal court may not entertain a § 4 petition based on the contents, actual or hypothetical, of a counterclaim.

*Id.* at 62 (emphasis added). The Court did not include diversity jurisdiction in its holding, despite acknowledging that diversity jurisdiction exists as a separate method for bringing a claim under the FAA. *See, for example, id.* at 65 (describing federal question jurisdiction, diversity jurisdiction, and maritime jurisdiction as separate bases for federal subject-matter jurisdiction). *See also Northport Health Servs. of Arkansas, LLC v. Rutherford*, 605 F.3d 483, 490–91 (8th Cir. 2010) (noting that the Supreme Court "carefully limited its statement of the issues and holding to federal question jurisdiction" and "cited the circuit court cases creating the federal question conflict but did not cite any of the circuit court § 4 diversity cases").

At least one district court within this circuit has similarly noted that *Vaden* is limited to cases involving federal question jurisdiction. *See Credit Acceptance Corp. v. Davisson*, 644

F. Supp. 2d 948, 953 (N.D. Ohio 2009) (noting that "the *Vaden* Court explicitly limited its holding to cases where the controversy underlying the § 4 petition involves *federal-question* jurisdiction"). And in an opinion this Court finds persuasive, the Eighth Circuit Court of Appeals reached the same conclusion. *See Northport Health,* 605 F.3d 490–91. Accordingly, the Court will not look through the present action for arbitration to determine whether it would have diversity over the state-law suit.

## C. Necessary and Indispensable Party

This then leaves Stacy's final argument that the Court lacks subject-matter jurisdiction to hear the case. Stacy contends that the action should be dismissed due to the plaintiffs' failure to join Schneider, an indispensable party under Rule 19. "Rule 19 of the Federal Rules of Civil Procedure establishes a three-step analysis for determining whether a case should proceed in the absence of a particular party." *PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 200 (6th Cir. 2001). The first step is to determine whether a party not joined is necessary under Rule 19(a). *Id.* If the party is necessary, the court must next determine whether joinder is feasible, considering whether the party is subject to personal jurisdiction and if joinder will destroy the court's subject-matter jurisdiction. *Id.* Finally, if joinder will destroy subject-matter jurisdiction—such as through joinder of a non-diverse party—the court must examine "whether in equity and good conscience the action should proceed" without the nonjoined party. *Id.* This analysis is governed by Rule 19(b), which provides four factors for the court to consider when determining whether a necessary party is indispensable. If the non-joined party is found to be indispensable under Rule 19(b), the Court must dismiss the action.

### 1. *Schneider Is a Necessary Party*

Under Rule 19(a), a party is necessary if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>
> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

In mixing the necessary and indispensable analyses, Stacy claims that Schneider is necessary because she (1) is a joint tortfeasor and (2) is bound by the arbitration agreement which might be subject to inconsistent interpretations in state and federal court. The first argument is without merit: the fact that Schneider is an alleged joint tortfeasor and Stacy therefore will have unresolved claims without Schneider's presence at arbitration does not make her a necessary party. *Temple v. Synthes Corp., LTD*, 498 U.S. 5, 8 (1990) ("As potential joint tortfeasors . . . [they] were merely permissive parties.").

The second argument carries more weight. As another district court in this circuit has noted, "if this Court and the state court were to reach different conclusions regarding whether the arbitration agreement is enforceable, [Schneider] would face inconsistent procedural remedies." *GGNSC Louisville Hillcreek, LLC v. Warner*, 2013 WL 6796421, at *3 (W.D. Ky. Dec. 19, 2013). This is enough to find Schneider a necessary party.

### 2. Schneider Is Not an Indispensable Party

There is no dispute that joining Schneider to this action will destroy the Court's subject-matter jurisdiction, and the next question is therefore whether she is indispensable such that the Court must dismiss the action rather than proceed without her. Under Rule 19(b),

"the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."

As noted above, Schneider is neither necessary nor indispensable simply because she is an alleged joint tortfeasor. The question, then, is confined to whether her interest in the arbitration agreement makes her indispensable. There are four factors courts consider when determining if a nonjoined party is so indispensable as to necessitate dismissing the action:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures;
>
> (3) whether a judgment rendered in the person's absence would be adequate; and
>
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).

Stacy relies on a district-court opinion in West Virginia to argue that Schneider is indispensable. In *Cytech Industries, Inc. v. Powell*, 630 F. Supp. 2d 680 (N.D. W. Va. 2009), the court found that an alleged joint tortfeasor was indispensable to a suit to compel arbitration. The court explained that if the case were to proceed without the non-diverse party, the plaintiff in the state court would be forced to pursue its claims in two different forums, and could be subject to potentially conflicting interpretations over the validity of the arbitration agreement. Drawing on Fourth Circuit precedent, the court found that the duplicative litigation and potentially inconsistent legal conclusions over the arbitration agreement created sufficient prejudice to deem the nonjoined party indispensable. *Id.* at 686.

But the Sixth Circuit has expressly rejected the argument that duplicative litigation and potentially inconsistent legal conclusions over an arbitration agreement are grounds for finding a party indispensable. In *PaineWebber*, the plaintiff sought to compel the heirs of its former employee to submit their state-law tort claims to arbitration. Like the instant case, PaineWebber sought an injunction in federal court rather than relying on a ruling from the state court. And just as is the case here, the defendant objected to the suit on the grounds that a non-diverse employee sued in the underlying state action was indispensable because of "the potentially inconsistent legal obligations that might result from conflicting interpretations of the arbitration clauses by state and federal courts." *PaineWebber*, 276 F.3d at 202. The Sixth Circuit rejected the defendant's argument, stating that

> Although we acknowledge the seriousness of [the defendant's] concerns, his characterization of the risks fails to take into account several important factors. These considerations indicate that the potential prejudice to [the defendant] or [the nonjoined party] if this action proceeds without [the nonjoined party] is minimal.
>
> As an initial matter, the possibility of having to proceed simultaneously in both state and federal court is a direct result of [the defendant's] decision to file suit naming PaineWebber and [the nonjoined party] in state court rather than to demand arbitration under the Master Account Agreement.
>
> . . .
>
> Even if the parallel proceedings were not the result of [the defendant's] pending state court action, the possibility of piecemeal litigation is a necessary and inevitable consequence of the FAA's policy that strongly favors arbitration.
>
> . . .
>
> [The possibility that] the federal and state courts will reach conflicting interpretations of the arbitration clauses does not present the degree of prejudice necessary to support a conclusion that [the nonjoined party] is an indispensable party. This possibility exists because [the defendant] chose to

> name both PaineWebber and [the nonjoined party] as
> defendants in the state court action.

*Id.* at 202–03 (internal citations omitted).

Applying the analysis in *PaineWebber*, another district court within this circuit has held that a nursing-home administrator is not an indispensable party when she is joined in the underlying state-tort action. *See Warner*, 2013 WL 6796421, at *3–4 (finding that "on balance, the factors do not dictate that the Court find [the administrator] is an indispensable party"). The reasoning for such a finding is clear: according to the Sixth Circuit, the possibility of inconsistent rulings coupled with the burden on the defendant in pursuing duplicative litigation is not sufficiently prejudicial to find a party indispensable. Thus, although there might be some prejudice and it is certainly true that the state court could provide adequate relief to the plaintiffs, the Court finds that Schneider is not indispensable under Rule 19(b) and the action may proceed without her.

### III.

Stacy contends that even if this Court has subject-matter jurisdiction, it should abstain from hearing the merits on the basis that there is a parallel suit pending in state court. "In certain 'exceptional' circumstances, [ ] a federal district court may abstain from exercising its subject matter jurisdiction due to the existence of a concurrent state court proceeding, based on 'considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *PaineWebber*, 276 F.3d at 206 (quoting *Colorado River*, 424 U.S. at 817). But "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule," and this "extraordinary and narrow exception" is only justified when it "would clearly serve an important countervailing interest." *Colorado River Water*, 424 U.S. at 813. As such, "[t]he decision to dismiss a federal action because of

a parallel state-court action rests 'on a careful balancing of the important factors as they apply in a given case, with the balance *heavily weighted in favor of the exercise of jurisdiction.*" *Great Earth Cos., Inc. v. Simons*, 288 F.3d 878, 886 (6th Cir. 2002) (emphasis added) (quoting *Moses H.*, 460 U.S. at 16).

Courts consider roughly eight factors when determining whether abstention under *Colorado River* is necessary. *PaineWebber,* 276 F.3d at 206 (citing *Romine v. Compuserve Corp.*, 160 F.3d 337, 340–41 (6th Cir. 1998)). These factors are:

> (1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; . . . (4) the order in which jurisdiction was obtained[;] . . . (5) whether the source of governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction.

*Id.* (citing *Romine*, 160 F.3d at 340–41). Although a few of these factors weigh in favor of abstention, none are strong enough to make this case an exceptional circumstances necessitating abstention. Moreover, the factors identified as the most important counsel in favor of exercising its jurisdiction.

The first two factors weigh against abstention. In a similar case where "the state court did not assume jurisdiction over any res or property," and both courts are geographically convenient, the Sixth Circuit has found these facts support exercising jurisdiction. *PaineWebber*, 276 F.3d at 207. On the other hand, factors four, seven, and eight, favor abstention—but only very slightly. The state court assumed jurisdiction first, but only by a few months, and nothing in the record indicates the suit has progressed very far. The slight time difference between the state- and federal-court filings is insufficient to persuade the Court to abstain. Where "there is no indication that any significant proceedings have taken

place in the state court," the importance of which court assumed jurisdiction first is diminished significantly. *See Great Earth*, 288 F.3d at 887.

The "most important" factor is the third factor, which asks "whether there is a 'clear federal policy evinc[ing] . . . the avoidance of piecemeal adjudication' found within the statutory scheme at issue." *Answers in Genesis of Kentucky, Inc. v. Creation Ministries Int'l., Ltd.*, 556 F.3d 459, 467 (6th Cir. 2009). The Sixth Circuit Court of Appeals has held that "[i]n the case of the Federal Arbitration Act, there most clearly is not such a policy." *Id.* at 467. This is because the FAA "requires district courts to compel arbitration . . . when one of the parties files a motion to compel, *even where the result would be the possibly inefficient maintenance of separate proceedings in different forums.*" *Id.* at 467–68. Thus, the most important factor when determining whether to abstain counsels against abstention in this case.

The fifth factor, whether federal or state law is the source of the dispute, also favors exercising jurisdiction. Here, the issues involve questions of both state and federal law. Important, however, is the fact that the "FAA provides the source of law for interpreting the arbitration clause[.]" *PaineWebber*, 276 F.3d at 208. Although it's true that "this factor is less significant where the state and federal courts have concurrent jurisdiction," *id.*, the Supreme Court has been careful to note that the court's "task in cases such as this is not to find some substantial reason for the *exercise* of federal jurisdiction . . . ; rather, the task is to ascertain whether there exist 'exceptional circumstances' . . . to justify the *surrender* of that jurisdiction." *Moses H.*, 460 U.S. at 25–26. Thus, to the extent that this case raises mixed questions of both federal and state law—with the FAA at the heart of the dispute— the fifth factor weighs in favor of exercising jurisdiction.

Finally, the sixth factor, which asks whether the state court will provide adequate protection of the plaintiffs' federal rights, favors abstention. Stacy argues that state court is more than capable of interpreting and applying the FAA, and that there is no reason to believe the plaintiffs' rights are in jeopardy in state court. Stacy's argument has support from the Sixth Circuit: in *PaineWebber*, the court held that because the FAA is "binding on state courts that interpret contracts involving interstate commerce," the sixth factor weighs in favor of abstaining. *PaineWebber*, 276 F.3d at 208.

In viewing all of the factors together, it's clear that the balance in this case weighs against abstention and in favor of the Court exercising its jurisdiction. Factors one, two, three, five, and six all counsel against abstention, while the remaining factors only slightly favor the opposite. Significantly, the third factor—which asks whether there is a clear federal policy evincing the avoidance of piecemeal litigation—is the most important factor and it weighs in favor exercising subject-matter jurisdiction. Courts both within this state and within the Sixth Circuit Court of Appeals have declined to abstain under *Colorado River* in similar circumstances, and this Court will do the same. *See PaineWebber*, 276 F.3d at 209; *Warner*, 2013 WL 6796421 at *6.

## IV.

Having determined that it will not abstain from ruling on the merits of this action, the Court turns to the remaining issues. The plaintiffs move this Court to compel Stacy to submit her claims currently pending in state court to arbitration, as required in her Residency Agreement. They further ask the Court to enjoin Stacy from continuing to pursue her state-court action. In response, Stacy objects to enforcement of the arbitration agreement on the grounds that it is unconscionable, against public policy, and was signed

by an agent without the authority to do so. Her objections are without merit and will be denied.

## A. Validity of the Arbitration Agreement

"When considering a motion to . . . compel arbitration under the" FAA, courts engage in a four-step analysis. *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000). The first is to "determine whether the parties agreed to arbitrate." *Id.* If so, then the second step is to consider the scope of the agreement. *Id.* Third, "if federal statutory claims are asserted, [the Court] must consider whether Congress intended those claims to be nonarbitrable." *Id.* Finally, "if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration." *Id. See also Compuserve, Inc. v. Vigny Int'l Finance, Ltd.*, 760 F. Supp. 1273, 1278 (S.D. Ohio 1990). In the present case, the defendant only contests the first issue, which is whether the parties entered into a valid arbitration agreement.

Stacy contends that the arbitration agreement is invalid for a variety of reasons spanning unconscionability, public policy, and agency law. Nearly all of the reasons advanced by Stacy are facially without any merit and have been repeatedly rejected by both federal and state courts.

The Court examines this case under the backdrop of a "strong federal policy in favor of arbitration." *See Hurley v. Deutsche Bank Trust Co. Ams.*, 610 F.3d 334, 338 (6th Cir. 2010) (quoting *Albert M. Higley Co. v. N/S Corp.*, 445 F.3d 861, 863 (6th Cir. 2006). This policy arises from the FAA, which "was designed to override judicial reluctance to enforce arbitration agreements." *Stout*, 228 F.3d at 714. Pursuant to the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. But when evaluating the

validity of an arbitration agreement, "any ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration." *Id.* (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) ("Thus, as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability.")).

But, as Stacy correctly notes, "the federal policy in favor of arbitration is not an absolute one. Arbitration under the Federal Arbitration Act is 'a matter of consent, not coercion.'" *Albert M. Higley Co.*, 445 F.3d at 863 (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. Of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)). "[N]o matter how strong the federal policy favors arbitration, arbitration is a matter of contract between the parties, and one cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration." *Simon v. Pfizer Inc.*, 398 F.3d 765, 775 (6th Cir. 2005) (internal quotations omitted). For this reason, state law regarding the enforceability of contracts applies with equal force to the validity of contracts to arbitrate.

It is on this point that Stacy grounds her argument, claiming that the arbitration agreement is an invalid contract under Kentucky common law, and therefore unenforceable under the FAA. Stacy's objection to the arbitration agreement comes largely in four parts. She argues that (1) the contract is unconscionable under Kentucky common law; (2) the contract violates public policy in light of the statutory protections afforded to nursing home residents; (3) the limitation on damages violates Kentucky law; and (4) Kim Stacy, who signed the agreement on behalf of the defendant, did not have the authority to do so.

The first three of Stacy's objections have been squarely rejected by numerous courts. Under Kentucky law, "[t]he doctrine [of unconscionability] is used by the courts to police the excesses of certain parties who abuse their right to contract freely. It is directed against

16

one-sided, oppressive and unfairly surprising contracts, and not against the consequences per se of uneven bargaining power or even a simple old-fashioned bad bargain." *Conseco Fin. Servicing Corp. v. Wilder*, 47 S.W.3d 335, 341–42 (Ky. Ct. App. 2001) (quoting *Louisville Bear Safety Serv., Inc. v. South Central Bell Tel. Co.*, 571 S.W.2d 438, 440 (1978)). This doctrine is a "narrow exception" to the fundamental rule that "absent fraud in the inducement, a written agreement duly executed by the party to be held, who had an opportunity to read it, will be enforced according to its terms." *Schnuerle v. Insight Commc'ns Co., L.P.*, 376 S.W.3d 561, 575 (Ky. 2012) (quoting *Conseco*, 47 S.W.3d at 341–42). According to Stacy, the arbitration agreement in this case is unconscionable because it is "overbroad," does not bind the facility, lacks consideration, and was "effectively mandatory." Not only do these arguments lack merit, most fly in the face of the clearly-established federal policy favoring arbitration.

Stacy's arguments against enforcing this agreement—at their core—are nothing more than objections to arbitration agreements *in general*, and therefore directly contradict the policy embodied in the FAA. Like many arbitration agreements, the one in the instant case cites as consideration the economic efficiencies gained through arbitration. Stacy refers to this consideration as "nonsensical" and accuses the plaintiff of engaging in "serious swindling." (DE 8, at 5). While Stacy might believe that these significant economic efficiencies are "nonsensical," courts have recognized this benefit of arbitration as one of the reasons the FAA was instituted in the first place. *See Stout*, 228 F.3d 714 ("The FAA was designed to . . . provide parties with a speedier and less costly alternative to litigation."). Stacy also claims that the agreement is not mutually binding because any claim the facility might have against Stacy is "not the same species as personal injury torts," and thus the facility "cedes nothing" by agreeing to arbitration. (DE 8, at 4). Again, this is nothing more

than an attack on arbitration itself: if the court system is sufficient to resolve both the claims brought by the facility and the resident, the only distinguishing feature here is that Stacy regards *arbitration itself* as insufficient, which says nothing about whether the contract is unconscionable.

Nor is there any merit to Stacy's suggestion that the agreement is procedurally unconscionable because it is a contract of adhesion. As the Supreme Court of Kentucky has said, "[a]dhesion contracts are not *per se* improper. On the contrary, they are credited with significantly reducing transaction costs in many situations." *Schnuerle*, 376 S.W.3d at 576. The Court in *Schnuerle* rejected the argument that a "non-negotiable, take it or leave it, adhesion contract" containing an arbitration agreement was procedurally unconscionable. *Id.* Instead, the Court found that where the agreement "was not concealed or disguised" and "its provisions [were] clearly stated such that purchasers of ordinary experience and education are likely to be able to understand it, at least in its general import; and its effect is not such as to alter the principal bargain in an extreme or surprising way," such agreements are not unconscionable. *Id.* at 576–77. Like *Schnuerle*, the agreement in this case was not concealed or disguised. On the contrary, the arbitration agreement was contained within its own subsection of the contract, repeatedly advised the parties to consult with an attorney before signing it, and made conspicuous all the important terms— such as emphasizing within the text that the parties were agreeing to forgo any trial by jury and submit their claims to arbitration. It is difficult to imagine what greater lengths the plaintiffs could have taken to make the arbitration agreement in this case more transparent to the consumer.

Stacy's claim that the arbitration agreement is against public policy must similarly be rejected. She argues that under Kentucky law it is against public policy for a mandatory

arbitration agreement to be contained within an admission contract at a nursing home facility. Even if this is true, the FAA overrides such a public policy. *See AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1747–48 (2011) (explaining that "a court may not rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable") (internal quotations omitted). In *Marmet Health Care Center, Inc. v. Brown*, 132 S. Ct. 1201 (2012), the Supreme Court reversed a decision by the West Virginia Supreme Court that held several binding arbitration agreements within a series of nursing-home contracts invalid. *Id.* at 1203–04. The West Virginia Supreme Court determined that these arbitration clauses were against the state's public policy, which the FAA did not pre-empt. But in a per curiam opinion, the Supreme Court of the United States flatly rejected this claim, holding that the FAA "requires courts to enforce the bargain of the parties to arbitrate." *Id.* at 1203. In doing so, the Court reinforced the rule it set out in *Concepcion*, which states that "[w]hen state law prohibits outright the arbitration of a particular type of claim, . . . [t]he conflicting [state law] is displaced by the FAA." *Concepcion*, 131 S. Ct. at 1747.

The Supreme Court's logic applies with just as much force in the present case. Stacy contends that Kentucky's public policy forbids mandatory arbitration agreements in the context of nursing home contracts. But such a state law that singles out arbitration as applied to a particular class of claims is preempted by the FAA. Thus, even if the public policy of Kentucky would render a mandatory arbitration agreement for admission to a nursing home unenforceable, the FAA controls.

The third argument advanced by Stacy is that the entire arbitration agreement is unenforceable because the contract contains a limitation of liability clause that Stacy believes is invalid under Kentucky law. Under Kentucky law, the unenforceability of a

particular provision in a contract does not render the entire agreement unenforceable or unconscionable. *See Francis v. Cute Suzie, LLC*, 2011 WL 2174348, *1, Civil Action No. 3:10-CV-00704 (W.D. Ky. June 2, 2011); *Schnuerle*, 376 S.W.3d at 565. Thus, the Court need not consider whether the limitation on liability is itself enforceable if—as is the case here—the clause is severable from the agreement to arbitrate.

Stacy rests her argument on the holding in *Mortgage Electronic Registration Systems, Inc. v. Abner*, 260 S.W.3d 351 (Ky. Ct. App. 2008), a Kentucky Court of Appeals case that found an arbitration agreement substantively unconscionable because it was intertwined with a provision prohibiting the arbitrator from awarding punitive damages. *Id.* at 355. Importantly, the *Abner* court found that the arbitration agreement was unconscionable because the *arbitration clause itself* imposed a limitation on damages that deprived one of the parties of their substantive statutory remedies. *Id.* But *Abner* does not stand for the proposition that all arbitration agreements are unenforceable simply because the contract contains a separate and unconscionable provision. Rather, as subsequent courts construing *Abner* have emphasized, the question is whether the arbitration clause is so intertwined with the unconscionable provision that the two clauses cannot be severed from each other. *See Francis*, 2011 WL 2174348 at *3–4 (holding that an arbitration clause is valid despite an accompanying limitation on liability because the latter is severable in the event it is found unconscionable). In *Abner*, the arbitration clause itself directly limited the arbitrator's ability to award damages and expressly prohibited it from modifying the terms of the contract. There was no way for an arbitrator to sever the unconscionable clause from the rest of the agreement.

But the instant case presents no such difficulty. The arbitration agreement in Stacy's contract is clearly severable from the limitation on liability. Although they appear in the

same section of the Residency Agreement, the two provisions are outlined in separate subsections and contain nothing that would suggest the validity of one is dependent on the other. In fact, the contract explicitly states that if either provision is found invalid and unenforceable, it may be severed from the remaining agreement. (DE 1-1, at 7). Because these clauses are severable from each other, and the arbitrator is granted the express authority to interpret the terms of the contract as needed, this Court need not resolve whether the former is unconscionable. Such a decision falls within the scope of the arbitrator's delegated authority.

The last of Stacy's objections to the enforceability of the arbitration agreement is that the durable power of attorney granted to Kim Stacy, which she used to sign the Residency Agreement on behalf of Anna Stacy, did not grant her the authority to bind her to arbitration. Whether Kim Stacy had the authority to sign the arbitration agreement under his power of attorney is determined by state law. In Kentucky, "an agent's authority under a power of attorney is to be construed with reference to the types of transaction expressly authorized in the document and subject always to the agent's duty to act with the 'utmost good faith.'" *Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581, 592 (Ky. 2012) (quoting *Wabner v. Black*, 7 S.W.3d 379, 381 (Ky. 1999)). Significantly, the Kentucky Supreme Court has held that when an agent engages in an action within her expressly delegated authority, the action might nonetheless be invalid if its incidental effect is to "create legal consequences for a principal that are significant and separate from the transaction specifically directed by the principal." *Id.* at 593 (quoting Restatement (Third) of Agency § 2.02). In other words, Kentucky law holds that even when an agent has the express authority to engage in a particular transaction, exercise of that authority might be

considered unauthorized if the incidental consequences of the transaction are so significant that they call into question the agent's good faith.

Stacy argues that such is the case in the instant matter. She contends that although Kim Stacy had the authority to sign the residency agreement in order to ensure her medical care, the "legal consequences" of the arbitration agreement "are significant and separate from the transaction specifically directed by the principal," and thus she exceeded her authority under the durable power of attorney when she signed it. To construct this argument, Stacy relies on *Ping*, where the Supreme Court of Kentucky found that a power of attorney agreement specifically authorizing the agent to make decisions reasonably necessary for the principal's medical care was not sufficient to authorize the agent's decision to execute a binding but optional arbitration agreement as part of a residency agreement at a nursing home.

But in making her argument, Stacy ignores clear language in *Ping* distinguishing it from the circumstances of the instant case. In *Ping*, the Supreme Court of Kentucky explicitly based its holding on the fact that the agent was only given the authority to make decisions reasonably necessary for the principal's medical care, and the arbitration agreement was *optional*. By agreeing to the arbitration clause, the agent significantly limited the legal rights of the principal and did so in a situation where it was *not necessary*. Unlike *Ping*, the arbitration agreement in the present case was a mandatory component of the Residency Agreement. And as the Court in *Ping* stated, "where an agreement to arbitrate is presented to the patient as a condition of admission to the nursing home, courts have held that the authority incident to a health-care durable power of attorney includes the authority to enter such an agreement." *Ping*, 376 S.W.3d at 593.

But even if *Ping* had not been careful to distinguish its holding from cases like the present one, Kim Stacy's durable power of attorney authorized a much broader set of actions than that found in *Ping*. The agent in *Ping* had only the authority to make reasonably necessary medical decisions and was thus limited to acting in pursuit of that power. Kim Stacy, however, was granted the power "[t]o make, execute, and deliver for [Anna] and in [her] name any and all deeds, documents, writings, checks, drafts and notes, of all kinds and descriptions." (DE 7-1, at 1). The power to execute any document or writing in the name of Anna Stacy is much broader than the power of attorney in *Ping*, which contemplated only the power to make reasonable health care decisions. This express grant of power permitted Kim Stacy to sign the arbitration agreement.

Finally, in her motion to dismiss Stacy makes one additional argument as to why this Court should not enforce the arbitration agreement pursuant to the requirements of the FAA. She contends that the arbitration agreement in this case is not governed by the FAA because it does not evidence a transaction involving interstate commerce. The FAA applies to "contract[s] evidencing a transaction involving commerce." 9 U.S.C. § 2. Under this provision, the scope of the FAA mirrors Congress's Article I power to regulate interstate commerce. *See Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) ("We have interpreted the term 'involving commerce' in the FAA as the functional equivalent of the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power."). Stacy contends that the arbitration agreement evidences only an *intrastate* contract and is therefore outside the scope of the FAA. But because its scope runs parallel to the Commerce Clause, "the FAA encompasses a wider range of transactions than those actually . . . within the flow of interstate commerce." *Id*. This means that the FAA will extend to transactions "in individual cases without

showing any specific effect upon interstate commerce if in the aggregate the economic activity in question would represent a general practice . . . subject to federal control." *Id*. at 56–57.

It is beyond dispute that the transaction in this case falls within the scope of the FAA. Stacy correctly contends that the care provided to her occurred only within the borders of Kentucky, but this is not the relevant question at issue. As another court in Kentucky explained in a similar case, "[t]he food, medicine, and durable medical supplies that [the plaintiffs] provided must come from somewhere." *Warner*, 2013 WL 6796421 at *8. There is no suggestion by Stacy that the services rendered by the plaintiffs were done so without the use of *any* goods purchased through interstate commerce, and the Court would be skeptical of such a claim. More importantly, the "general activity" of providing healthcare to Stacy— even if contained to an intrastate market in this individual case—is without a doubt the kind of activity that in the aggregate is subject to federal control under the Commerce Clause. *See Warner*, 2013 WL 6796421 at *7–8. The arbitration agreement in this case is a component of a larger contract that evidences a transaction involving interstate commerce.

The arbitration agreement in this case is valid and enforceable under both the FAA and Kentucky law. Because this agreement is valid, Stacy must submit her claims regarding the care and treatment at her nursing home facility to arbitration according to the agreement's terms.

## B. Injunction Prohibiting Pursuit of Pending State-Court Action

Having found that Stacy must submit her claims to arbitration, the question turns to whether this Court should enjoin the defendant from pursuing her parallel action in state court. The Court finds that such an injunction is necessary, and the defendant is enjoined from proceeding with her state-court action. "Although the FAA requires courts to stay

their own proceedings where the issues to be litigated are subject to an agreement to arbitrate, it does not specifically authorize federal courts to stay proceedings pending in state courts." *Great Earth*, 288 F.3d at 893 (quoting *Ultracashmere House, Ltd. V. Meyer*, 664 F.2d 1176, 1180 (11th Cir. 1981)) (internal citations omitted). For this reason, "the district court's authority to enjoin state-court proceedings is subject to the legal and equitable standards for injunctions generally, including the Anti Injunction Act." *Id.* Pursuant to the Anti-Injunction Act, "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, *or to protect or effectuate its judgments.*" 28 U.S.C. § 2283 (emphasis added).

An injunction in this case "properly falls within the exception for injunctions 'necessary to protect or effectuate [this Court's] judgments.'" *Great Earth*, 288 F.3d at 894. The Court has determined that the parties entered into a binding arbitration agreement covering the scope of Stacy's claims. Having made such a determination and compelling Stacy to submit to arbitration, it is necessary to enjoin Stacy from pursing her claims in *any* alternative forum, including state court. Otherwise, Stacy would be permitted to circumvent her arbitration agreement and in doing so, circumvent this Court's judgment that she be compelled to arbitrate her claims. Accordingly, the Court will order that Stacy be enjoined from proceeding with her pending state-court action.

## V.

The Court has found that the plaintiff corporations and Anna Stacy entered into a binding and valid arbitration agreement that covers within its scope Stacy's claims brought in the pending action in Fayette Circuit Court. Because this agreement is valid, Stacy must

submit her claims to arbitration and is enjoined from proceeding with her state-court action. Accordingly, **IT IS ORDERED** that:

1. The defendant's motion to dismiss (DE 5) is **DENIED**;

2. The plaintiffs' motion to compel arbitration and enjoin the state-court proceedings (DE 7) is **GRANTED**;

3. Teresa Stacy is **COMPELLED** to submit her claims to arbitration according to the terms of her agreement and **ENJOINED** from proceeding with her action in state court; and

4. The Court will stay this proceeding until the conclusion of the ordered arbitration.

Dated this 20th day of June, 2014.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY